# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NORTH CAROLINA | ) ) ) | **No. 22-CV-560** |
| Plaintiff, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| SHARON RAYNES HALLIDAY and RAPHA HEALTHCARE SERVICES, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Dr. Sharon Raynes Halliday (Defendant or Dr. Halliday) is a foreign-trained psychiatrist who was therefore unable to obtain a standard medical license in the United States. Instead, she obtained a Faculty Limited License (FLL) from the North Carolina Medical Board (NCMB). Under the contours of the FLL, Dr. Halliday was limited in her ability to prescribe controlled substances. Nonetheless, Dr. Halliday repeatedly wrote thousands of prescriptions for controlled substances for patients at her practice, RAPHA Healthcare Services, LLC (Defendant or RAPHA), that Dr. Halliday was not licensed to write, including for Medicare and Medicaid patients, from 2015 until the NCMB suspended her FLL in 2018.

These prescriptions were all invalid in that Dr. Halliday lacked state authority. Thus, Dr. Halliday's prescriptions were outside the course of professional practice and resulted in false claims to Medicare and Medicaid. The United States of America, by and through

Sandra J. Hairston, United States Attorney for the Middle District of North Carolina, and the State of North Carolina, by and through Joshua H. Stein, Attorney General for the State of North Carolina (collectively also referred to as "the Governments"), bring this suit to address Dr. Halliday's improper controlled substance prescribing and the damages incurred to the Governments as a result.

## JURISDICTION

1.      This action is brought by the United States for civil penalties under the Controlled Substances Act, 21 U.S.C. §§ 801-971, and by the United States and the State of North Carolina for civil damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 and the North Carolina False Claims Act, N.C.G.S. § 1-605 et seq.

2.      This Court has subject matter jurisdiction over the alleged Controlled Substances Act civil penalties, 21 U.S.C. § 842, pursuant to 21 U.S.C. § 842(c)(1)(A), and 28 U.S.C. §§ 1331, 1345, and 1355.

3.      This Court has subject matter jurisdiction over the alleged False Claims Act counts, 31 U.S.C. § 3729, pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331, 1345, and 1355.  Further, this Court has supplemental jurisdiction to entertain the claims of the State of North Carolina pursuant to 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

4.      This Court may exercise personal jurisdiction over Defendants because they reside in, are located in, transacted business in, and committed the acts at issue in the Middle District of North Carolina.

2

5. Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and 1395, because Defendants are located, reside, did business, and a substantial part of the events giving rise to this action occurred in this District.

**PARTIES**

6. Plaintiff United States of America brings this action on behalf of the Department of Justice, as delegated to the Drug Enforcement Administration (DEA), which regulates the distribution of controlled substances under the authority of the Controlled Substances Act, and on behalf of the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), which administer the Medicare program and work with each participating state to administer the Medicaid program.

7. The State of North Carolina brings this action on behalf of the North Carolina Department of Health and Human Services, Division of Health Benefits (NCDHB).[1] NCDHB administers the Medicaid program in North Carolina. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily low-income individuals and people with disabilities.

8. Defendant Sharon Raynes Halliday, M.D. is a resident of Durham County, North Carolina. During the allegations in this complaint, Defendant practiced medicine in Durham County, North Carolina.

---

[1] The Division of Medical Assistance (NCDMA) previously administered the Medicaid program in North Carolina.

3

9.     Defendant RAPHA is a Limited Liability Corporation authorized and existing under the laws of the State of North Carolina, with its principal place of business in Durham, North Carolina. During the relevant time period, RAPHA also operated clinics in Lumberton, Louisburg, and Mooresville, North Carolina.

## LEGAL AND REGULATORY BACKGROUND

### I.     The Controlled Substances Act

10.     Congress passed the Controlled Substances Act (CSA) in 1970 after determining that the illegal distribution and improper use of controlled substances had "a substantial and detrimental effect on the health and general welfare of the American people." *See* 21 U.S.C. § 801.

11.     The CSA and its regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. A "controlled substance" is any drug or other substance included in schedule I, II, III, IV, or V of the CSA. *See* 21 U.S.C. § 802(6).

12.     Because one of the goals of the CSA is to prevent the diversion of drugs from legitimate to illegitimate channels, the CSA established a closed regulatory system in which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. *See* 21 U.S.C. § 841(a)(1).

13.     In order to track the legitimate dispensation of controlled substances by health care professionals, the CSA requires practitioners who wish to write prescriptions for controlled substances to register with the DEA. *See* 21 U.S.C. § 822(a)(2); 21 U.S.C. §

4

802(10); 21 U.S.C. § 802(21). Practitioners registered with the DEA to dispense controlled substances are authorized to dispense only to "the extent authorized by their registration," and must do so in conformity with the other provisions of the CSA. *See* 21 U.S.C. § 822(b).

14.     Under the CSA, a prescription for a controlled substance can only be issued by a practitioner who is: (1) authorized to prescribe controlled substances by the jurisdiction in which she is licensed; and (2) registered with the DEA in the state where the prescription is issued. *See* 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

## II.     The False Claims Act

15.     The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(a)(1)(C) conspires to commit a violation of subparagraph (A) [or] (B) …

is liable to the United States for three times the amount of damages which the Government sustains, plus a civil penalty per violation. 31 U.S.C. § 3729(a). For violations occurring between September 28, 1999 and November 1, 2015, the civil penalty amounts range from a minimum of $5,500 to a maximum of $11,000. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, *47103 (1999). For violations occurring on or after November 2, 2015, the civil penalty amounts range from a minimum of $12,537 to a maximum of $25,076. 28 C.F.R. § 85.5.

16.     For purposes of the FCA,

the terms "knowing" and "knowingly" (A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in

5

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. . . .

31 U.S.C. § 3729(b)(1).

17.     The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

18.     The North Carolina FCA provides, in pertinent part, that any person who:

(a)(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
(a)(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
(a)(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section…

shall be liable to the State for three times the amount of damages that the State sustains because of the act of that person. A person who commits any of the acts also shall be liable to the State for the costs of a civil action brought to recover any of those penalties or damages and shall be liable to the State for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as may be adjusted by Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, P.L. 101-410, as amended, for each violation.

19.     The NCFCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." N.C.G.S. §1-606.

6

### III. The Medicare Program

20.    In 1965, Congress enacted Title XVIII of the Social Security Act (Act), known as the Medicare program (Medicare), to pay for the costs of certain health care services. *See* 42 U.S.C. §§ 1395, *et seq*. HHS is responsible for overseeing Medicare and entrusts CMS, one of its components, to administer the program.

21.    Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1, 426A. Individuals who are insured under Medicare are called Medicare "beneficiaries."

22.    Medicare consists of four parts: A, B, C, and D. Part D covers the costs of certain prescription drugs for Medicare beneficiaries. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

23.    Medicare provides Part D coverage through plan "sponsors," which are private entities that administer the prescription drug plans on behalf of the federal government.

24.    Part D plan sponsors provide reimbursement to pharmacies for drugs dispensed to Medicare beneficiaries enrolled in Part D.

25.    Claims submitted for these drugs are recorded and sent to CMS through a prescription drug event (PDE) record, which contains information about the drug dispensed, the beneficiary, the practitioner who prescribed the drug, and payment.

26.    CMS makes payments to reimburse the sponsors through (a) monthly estimated payments based upon the beneficiaries enrolled; (b) cost-sharing subsidies for

Case 1:22-cv-00560-WO-JEP   Document 1   Filed 07/17/22   Page 7 of 24

low-income individuals; and (c) payments made annually that reconcile the estimated monthly payments with the allowable costs the sponsor actually incurred. The PDE records are a significant factor influencing the reimbursement amounts.

27.     Part D plan sponsors repeatedly certify their compliance with applicable federal laws, regulations, and CMS guidance and certify to the accuracy and truthfulness of the data in the PDE records as a condition of payment.

28.     All Medicare providers, including Dr. Halliday and RAPHA, must complete and sign a Medicare Enrollment Application, which includes a "Certification Statement" setting forth standards that must be met for initial and continuous enrollment in the Medicare program to order and certify items and services for Medicare beneficiaries or prescribe Part D drugs. These providers agree to adhere to the requirements listed, including:

     a.     "[They] have read and understand the Penalties for Falsifying Information, as printed in this application."

     b.     "[They] understand that any deliberate omission, misrepresentation or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil and/or administrative penalties including, but not limited to . . . the imposition of fines, civil damages and/or imprisonment."

8

c. "[They] agree to abide by the Medicare laws, regulations and program instructions that apply to [them] or to the organization listed in Section 4A of this application."

d. "[They] understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[.]"

e. "[They] will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare."

29. Part D plan sponsors are only permitted to provide benefits for Part D drugs "that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). A prescription is only valid if it "complies with all applicable State law requirements constituting a valid prescription." 42 C.F.R. § 423.100.

30. From May 2015 through August 2018 (hereinafter "the relevant time period"), Defendants were enrolled and participating Medicare providers.

31. During the relevant time period, Defendants caused pharmacies to bill Medicare for invalid drug prescriptions.

## IV. The North Carolina Medicaid Program

32. The North Carolina Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq.* Medicaid is jointly funded by participating states and the federal government that provides health care benefits for certain groups,

9

including the poor and disabled. While drug coverage is an optional benefit, the Medicaid programs of all states provide reimbursement for prescription drugs. Each state must have a single state agency to administer the Medicaid program. 42 U.S.C. § 1396a.

33. The North Carolina Division of Health Benefits (NCDHB) administers the Medicaid program in North Carolina and receives, processes, and pays claims for services under the Medicaid program. HHS periodically reimburses NCDHB for the federal share of all qualified Medicaid claims and ensures that the state complies with minimum standards in the administration of the program.

34. Providers bill Medicaid for services provided to Medicaid beneficiaries by submitting claim forms electronically to NCDHB through its fiscal agent. This fiscal agent was Computer Sciences Corporation, which later became CSRA Inc. Since April 2018, following an acquisition, CSRA has been known as GDIT.

35. The electronic Medicaid claim forms pharmacies submit to NCDHB through its fiscal agent contain certain information regarding the medication dispensed and request payment for the pharmacy provider.

36. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter.

37. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payments for drugs, are presented for payment.

After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. § 430.30.

38.     Medicaid providers, including pharmacies, must affirmatively certify compliance with applicable federal and state laws and regulations.

39.     Medicaid requires compliance with Medicaid program policies, along with other federal and state regulations and program instructions as a precondition of government payment.

40.     NCDHB issues Medicaid policies, bulletins, and other materials to provide guidance to providers regarding which services are reimbursable by Medicaid and how to bill those services.  *See* 42 C.F.R. § 431.18.

41.     During the relevant time period, Defendants were enrolled and participating Medicaid providers.

42.     Because it is not feasible for the Medicaid program, or its contractors, to review records corresponding to each of the claims for payment it receives from providers, the program relies on providers to comply with Medicaid requirements and relies on providers to submit truthful and accurate certifications and claims.

43.     During the relevant time period, Defendants caused pharmacies to bill Medicaid for invalid drug prescriptions.

11

## FACTUAL BACKGROUND

44.     Dr. Halliday attended the University of the West Indies in Jamaica for her medical degree, and she graduated in 1999. She completed a psychiatry residency in Jamaica in 2005. She also completed various addiction specialist certifications with the North Carolina Substance Abuse Professional Practice Board, none of which required a medical degree.

45.     On February 24, 2012, Defendant's husband, Basil Halliday, registered Adaptive Integrated Methods, LLC, also known as AIM Health Services, LLC (AIM) with the North Carolina Secretary of State. AIM was a substance abuse treatment clinic, last located at 4411 Ben Franklin Boulevard, Durham, North Carolina 27704.

46.     On October 21, 2013, AIM and Duke University (Duke) entered into an Affiliation Agreement, titled Graduate Medical Training Letter of Agreement for Clinical Rotations (Rotation Agreement), whereby Duke agreed to send medical residents on a six-to-twelve-week rotation through AIM. Dr. Halliday signed the Rotation Agreement as an Assistant Supervising Physician, but also signed an addendum stating that she would not supervise residents until she was fully licensed.

47.     Upon information and belief, Dr. Halliday indicated to Duke that she would be teaching residents as a licensed addiction specialist rather than a physician.

48.     On February 4, 2014, the first of the 16 total Duke residents visited AIM as part of the Rotation Agreement. On August 18, 2015, the last of the 16 total Duke residents visited AIM as part of the Rotation Agreement. Based on feedback Duke received from its

12

physicians, it stopped sending residents to AIM, and no residents rotated through AIM after August 18, 2015. None of the 16 residents who visited AIM as part of the Rotation Agreement worked more than two workdays at the clinic, while most worked less than a total of 8 hours.

49. In or around May 2014, Basil Halliday requested that Duke give Dr. Halliday a faculty appointment for purposes of her licensure.

50. Duke did not question the need for Dr. Halliday to obtain a state medical license.

51. On or about June 16, 2014, Dr. Halliday formed Research and Professional Holistic Alternative, LLC. By June 2015, Dr. Halliday changed the name of this company to RAPHA Healthcare Services, LLC. RAPHA operates four clinic locations, one of which is located at 4411 Ben Franklin Boulevard, Durham, North Carolina 27704. RAPHA is a substance abuse treatment clinic, and the other three locations are in Lumberton, Louisburg, and Mooresville, North Carolina.

52. Duke did not and never has had any Affiliation Agreement or Rotation Agreement with RAPHA.

53. On November 4, 2014, Dr. Halliday received a letter from Duke approving her as a Consulting Associate, effective October 1, 2014 through June 30, 2015. This position was automatically renewed annually as part of a stack of other appointments for other physicians.

13

54. On December 29, 2014, after Dr. Halliday failed to fully complete an application in 2013, the NCMB received Dr. Halliday's application for a Medical School Faculty License, which is also referred to as a Faculty Limited License (FLL).

55. In support of this application, Duke submitted a Verification of Appointment form, which certified that Dr. Halliday received a full-time appointment at Duke as a lecturer, effective January 1, 2015.

56. On or about May 15, 2015, the NCMB issued a FLL to Defendant.

57. The boundaries of the FLL are contained in N.C. Gen. Stat § 90-12.3. This statute provides that the NCMB may issue a FLL to a physician who "holds a full-time appointment as either a lecturer, assistant professor, associate professor, or full professor" at certain North Carolina medical schools, which includes Duke. Additionally, the statute details that the holder of the FLL "shall not practice medicine or surgery outside the confines of the medical school or its affiliates."

58. Duke never authorized Dr. Halliday to practice medicine at any hospital within the Duke system or to practice medicine at any Duke affiliate.

59. Upon receiving her FLL, Dr. Halliday used it to obtain a DEA registration to prescribe controlled substances on May 19, 2015.

60. Once Dr. Halliday obtained her DEA registration and until her FLL was revoked in 2018, Dr. Halliday wrote thousands of prescriptions for controlled substances to patients at all four RAPHA clinics outside the confines of Duke's medical school or its affiliates.

14

61.     For example, between the dates of September 16, 2015 and February 21, 2018, Dr. Halliday wrote 196 prescriptions on behalf of Medicaid recipient J.B. with no authorization from Duke. Dr. Halliday also signed and submitted Prior Approval request forms to Medicaid as a prescriber on J.B.'s behalf, in furtherance of Medicaid paying for prescriptions written by Dr. Halliday that were outside the bounds of her FLL. As a result, North Carolina Medicaid paid for $4,492.81 in prescriptions written by Dr. Halliday at RAPHA for Medicaid recipient J.B., all of which were outside the bounds of Dr. Halliday's FLL.

62.     Similarly, between the dates of May 3, 2018 and June 25, 2018, Dr. Halliday wrote 18 prescriptions on behalf of Medicaid recipient C.Y. with no authorization from Duke. Dr. Halliday also signed and submitted Prior Approval request forms to Medicaid as a prescriber on C.Y.'s behalf, in furtherance of Medicaid paying for prescriptions written by Dr. Halliday that were outside the bounds of her FLL. As a result, North Carolina Medicaid paid for $6,622.69 in prescriptions written by Dr. Halliday at RAPHA for Medicaid recipient C.Y., all of which were outside the bounds of Dr. Halliday's FLL.

63.     In addition, between the dates of April 16, 2016 and June 25, 2018, Dr. Halliday wrote 293 prescriptions on behalf of Medicare recipient L.F. with no authorization from Duke. Medicare paid for $35,260.50 in prescriptions written by Dr. Halliday at RAPHA for Medicare recipient L.F., all of which were outside the bounds of her FLL.

64.     Between the dates of November 2, 2016 and August 20, 2018, Dr. Halliday wrote 249 prescriptions on behalf of Medicare recipient W.H. with no authorization from

Duke. Medicare paid for $13,112.25 in prescriptions written by Dr. Halliday at RAPHA for Medicare recipient W.H., all of which were outside the bounds of her FLL.

65.     Despite no Duke residents rotating through AIM after August 2015 nor receiving any permission from Duke to treat patients through Duke's medical school or its affiliates, on her 2015, 2016, and 2017 NCMB Physician License Renewal, Dr. Halliday certified the following statement: "I certify that I remain eligible for continued medical school faculty limited licensure, that I have a full time faculty appointment at a North Carolina medical school, and that I am limiting my practice to the confines of my employment as a member of the medical school faculty."

66.     On May 17, 2018, after learning that Dr. Halliday was operating multiple RAPHA clinics using her FLL outside the confines of Duke's medical school or its affiliates, Duke terminated Dr. Halliday's consulting appointment.

67.     On June 6, 2018, Dr. Halliday signed an Interim Non-Practice Agreement with the NCMB.

68.     On July 13, 2018, the NCMB entered a public Interim Non-Practice Agreement wherein it concluded that Dr. Halliday had practiced medicine beyond the scope of her FLL and ordered Dr. Halliday not practice medicine until given permission by the NCMB.

# FIRST CAUSE OF ACTION
## Against Sharon Raynes Halliday
## Controlled Substances Act: Dispensing controlled substances by means of invalid prescriptions
## 21 U.S.C. § 842(a)(1)

69. The Governments re-allege and incorporate by reference all Paragraphs of this Complaint set out above as if fully set forth here.

70. Between April 16, 2016 and August 29, 2018, Dr. Halliday wrote thousands of prescriptions for controlled substances at her four RAPHA clinics.

71. At all times between April 16, 2016 and August 29, 2018, Dr. Halliday lacked authorization from Duke to treat and prescribe drugs to patients as part of her duties as a lecturer.

72. Because Dr. Halliday lacked an unrestricted medical license and could only practice within the confines of her lecturer appointment with Duke, she was not entitled to issue prescriptions to patients at her four RAPHA clinics. *See* 21 C.F.R. § 1306.03.

73. As a result, the thousands of prescriptions Dr. Halliday issued between April 16, 2016 and August 29, 2018 were invalid and issued outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a), (b), and (c), and 842 (a)(1) and 21 C.F.R. § 1306.04. Therefore, Dr. Halliday is liable to the United States for a civil penalty in the amount of not more than $72,683 for each violation pursuant to 21 U.S.C. § 842(c)(1)(A) and 28 C.F.R. § 85.5.

17

## SECOND CAUSE OF ACTION
### Against Sharon Raynes Halliday and RAPHA
### False Claims Act: Causing false claims by issuing invalid prescriptions
### 31 U.S.C. § 3729(a)(1)(A)

74.    The Governments re-allege and incorporate by reference all Paragraphs of this Complaint set out above as if fully set forth here.

75.    As set forth more fully above, Dr. Halliday knowingly practiced medicine without authorization, including writing prescriptions for patients.

76.    Dr. Halliday and RAPHA knew the prescriptions she wrote were false or fraudulent because she wrote them without authorization from Duke and was practicing outside the bounds of her FLL.

77.    From May 15, 2015 through August 29, 2018, Dr. Halliday and RAPHA knowingly caused to be presented materially false and fraudulent claims for payment or approval to Medicare and Medicaid for prescription drugs based on these invalid prescriptions.

78.    Dr. Halliday and RAPHA caused such claims to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

79.    The Government sustained damages because of this wrongful conduct.

18

## THIRD CAUSE OF ACTION
## Against Sharon Raynes Halliday and RAPHA
## False Claims Act: False Statements Material to False Claims
## 31 U.S.C. § 3729(a)(1)(B)

80.     The Governments re-allege and incorporate by reference all Paragraphs of this Complaint set out above as if fully set forth here.

81.     During the relevant time period, Dr. Halliday and RAPHA knowingly made, used, and caused to be made or used false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of the defendant's statements and actions.

82.     These false records and statements included the writing of false and invalid prescriptions without authorization from Duke, with Dr. Halliday writing prescriptions outside the bounds of Dr. Halliday's FFL, and Dr. Halliday certifying to the NCMB that, among other representations made, "I am limiting my practice to the confines of my employment as a member of the medical school faculty," when in fact, Dr. Halliday was not.

83.     Dr. Halliday and RAPHA made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

84.     The United States sustained damages because of this wrongful conduct.

Case 1:22-cv-00560-WO-JEP   Document 1   Filed 07/17/22   Page 19 of 24

## FOURTH CAUSE OF ACTION
## Against Sharon Raynes Halliday and RAPHA
## North Carolina False Claims Act: Presenting and Causing False Claims
## N.C.G.S. §1-605, *et seq.*

85.     The Governments re-allege and incorporate by reference all Paragraphs of this Complaint set out above as if fully set forth here.

86.     As set forth more fully above, Dr. Halliday knowingly practiced medicine without authorization, including writing prescriptions for patients.

87.     Dr. Halliday and RAPHA knew the prescriptions she wrote were false or fraudulent because she wrote them without authorization from Duke and was practicing outside the bounds of her FLL.

88.     From May 15, 2015 through August 29, 2018, Dr. Halliday and RAPHA knowingly caused to be presented materially false and fraudulent claims for payment or approval to Medicaid for prescription drugs based on these invalid prescriptions.

89.     Dr. Halliday and RAPHA caused such claims to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

90.     Through the acts described above, Dr. Halliday and RAPHA knowingly presented, or caused to be presented, false or fraudulent claims for payment to a recipient of Medicaid funds to be spent or used on the State of North Carolina's behalf and to advance healthcare programs under the Medicaid program in violation of N.C.G.S. §1-607(a)(1).

91.     Through the acts described above, Dr. Halliday and RAPHA knowingly

made, used, or caused to be made or used, a false record or statement material to false or fraudulent claims for payment or approval to a recipient of Medicaid funds to be spent or used on the Government's behalf and to advance healthcare programs, in violation of N.C.G.S. §1-607(a)(2).

92.     These false records and statements included the writing of false and invalid prescriptions without authorization from Duke, with Dr. Halliday writing prescriptions outside the bounds of Dr. Halliday's FFL, and Dr. Halliday certifying to the NCMB that, among other representations made, "I am limiting my practice to the confines of my employment as a member of the medical school faculty," when in fact, Dr. Halliday was not.

93.     By reason of Dr. Halliday and RAPHA causing false or fraudulent claims to be made, the State of North Carolina suffered damages and therefore is entitled to treble damages under the North Carolina False Claims Act, to be determined at trial, plus a civil penalty for each violation.

94.     By reason of Dr. Halliday and RAPHA making, using, or causing to be made or used a false record or statement material to false or fraudulent claims, the State of North Carolina suffered damages and therefore is entitled to treble damages under the North Carolina False Claims Act, to be determined at trial, plus a civil penalty for each violation.

95.     Defendants are liable to the State of North Carolina for the costs of this civil action under N.C.G.S. §1-607(a).

## FIFTH CAUSE OF ACTION
## Against Sharon Raynes Halliday and RAPHA
## Common Law Fraud

96.     The Governments re-allege and incorporate by reference all Paragraphs of this Complaint set out above as if fully set forth here.

97.     This is a claim at common law for fraud and deceit.

98.     The false statements made by Defendants as described above were misrepresentations of material facts.

99.     Defendants made these misrepresentations of material facts with knowledge of their falsity and/or with reckless disregard for their truth.

100.    Defendants made these misrepresentations of material facts knowing that the Governments would rely on their accuracy in paying the claims submitted.

101.    The Governments justifiably relied upon Defendants' misrepresentations in making payments on healthcare claims made.

102.    Through the acts described above, Defendants have perpetuated a fraud and deceit upon the Governments and, as a result, the Governments have suffered damages for the above-referenced fraud.

## PRAYER FOR RELIEF

The Governments demand and pray that judgment be entered in their favor against Defendants as follows:

22

A.    On Count I under the Controlled Substances Act against Dr. Halliday, a civil penalty for each of the prescriptions for a controlled substance issued in violation of the CSA.

B.    On Counts II and III under the False Claims Act, for the amount of damages during the relevant time period, trebled as required by law, plus costs of investigation and prosecution, and such civil penalties for each false claim as are authorized by law, together with such further relief as may be just and proper.

C.    On Count IV under the North Carolina False Claims Act, for the amount of the State of North Carolina's damages during the relevant time period, trebled as required by law, plus costs of investigation and prosecution, and such civil penalties for each false claim as are authorized by law, together with such further relief as may be just and proper.

D.    On Count V for common law fraud, for damages sustained and/or amounts by which Defendants perpetrated fraud against the Governments, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

E.    Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

The Governments demand a jury trial in this case on all issues so triable.

Dated: July 17, 2022

Respectfully submitted,

FOR THE UNITED STATES:                    FOR THE STATE OF NORTH CAROLINA:

SANDRA J. HAIRSTON                        JOSHUA H. STEIN
United States Attorney                    North Carolina Attorney General


 _/s/ Rebecca A. Mayer_                    _/s/ Matthew R. Petracca_
Rebecca A. Mayer, TX Bar # 24092376       Matthew R. Petracca, NCSB # 53350
Cassie L. Crawford, NCSB # 45396          Special Assistant U.S. Attorney
Assistant U.S. Attorneys                  NC Special Deputy Attorney General
101 South Edgeworth Street, 4th Floor     5505 Creedmoor Rd, Suite 300
Greensboro, North Carolina 27401          Raleigh, NC 27612
(336) 333-5351                            (919) 881-2320
cassie.crawford@usdoj.gov                 MPetracca@ncdoj.gov
rebecca.mayer@usdoj.gov